[Civ. No. 1796.   Fourth Appellate District.—March 18, 1937.]

A. L. ROSS, Plaintiff and Appellant, v. THE FIRST NA-
TIONAL TRUST AND SAVINGS BANK OF SAN
DIEGO (a National Banking Association) et al., De-
fendants and Respondents; SECURITY FIRST NA-
TIONAL BANK OF LOS ANGELES (a National
Banking Association), as Executor, etc., Defendant and
Appellant.

Ed P. Sample and William H. Wylie for Appellants.

William G. Mirow and Michael G. Luddy for Respondents.

MARKS, J.—This is an appeal from a judgment in favor of the defendants and cross-defendants, The First National Trust and Savings Bank and A. G. Smith, and against plaintiff A. L. Ross and cross-complainant Security-First National Bank of Los Angeles as executor of the last will and testament of William A. Edwards, deceased.

During the period here involved the First National Trust and Savings Bank of San Diego consolidated and merged with the First Trust and Savings Bank of San Diego under the former name. The latter's banking house in East San Diego, at which the earlier part of the transactions here involved took place, became a branch of the First National Trust and Savings Bank of San Diego. For brevity we will refer to this bank and the East San Diego branch as "the bank", and to the Security-First National Bank of Los Angeles as the "executor".

For some time prior to September 1, 1927, the El Cerrito Park Company owned a tract of land in the city of San Diego which was being subdivided and sold by A. G. Smith, who was in possession of it under a contract of purchase. Smith had sold many parcels of land in this subdivision under conditional sales contracts. These contract were made payable to him and were deposited by him in the bank for collection. The unpaid amounts on these contracts, in the bank for collection, were as follows: On August 2, 1927, $140,300.51, on September 1, 1927, $139,535.83, and on November 7, 1927, an amount in excess of $100,000.

Previous to September 1, 1927, the El Cerrito Park Company had issued 7,500 shares of its capital stock to the following persons: William A. Edwards, 625 shares; J. T.

Kaidel, 625 shares; F. E. Patterson, 875 shares; C. D. Sprigg, 312½ shares; C. P. Douglass, 312½ shares; H. S. Richards, 250 shares; A. L. Ross, 1375 shares; Pauline H. Bowen, 625 shares; D. E. Boone, 1562½ shares; A. G. Smith, 937½ shares. Prior to that date A. G. Smith had conceived the idea of acquiring all of the issued stock of the company. Under date of August 2, 1927, he wrote the company putting a value of $200,000 on its issued stock and offered to acquire it from the stockholders on the basis of that valuation.

Under date of September 1, 1927, a contract was entered into between Smith, as party of the first part, and stockholders Edwards, Kaidel, Patterson, Sprigg, Douglass, Richards and Ross, as parties of the second part, whereby the second parties agreed to sell their stock and Smith agreed to buy it for $116,666.66. One-half was to be paid in cash within three months. The balance was to be paid through collections on conditional sales contracts belonging to Smith and deposited by him in the bank, subject to the express provision that the total purchase price was to be paid by Smith by September 1, 1930. The language of the contract is confusing, probably due to the fact that Smith had placed a total value of $200,000 on the entire issued stock of the El Cerrito Park Company and he was acquiring, under the contract, only the stock owned by the seven stockholders who were the parties of the second part to the contract of sale of September 1, 1927. It was provided that he was to acquire the stock of Pauline H. Bowen and D. E. Boone directly from them.

It was provided that $100,000 ''in good paying contracts'' on file in the bank should be guaranteed by Smith and that the receipts from them should be apportioned among the seven stockholders signing the contract until the deferred payments amounting to $58,333.33, and interest, were paid. It was also provided that in the event any purchaser was in default for ninety days on his contract that Smith should either replace such contract with one not in default or pay the contract price within ninety days.

It would seem to have been the intention of the parties, as expressed in the none too definite terms of the contract, or to be inferred from them, that an escrow be opened in the bank into which would be deposited the stock of the seven stockholders and the $100,000 in contracts, with the bank

as agent of both parties for the purpose of carrying out the escrow.

The evidence as to subsequent events is sharply conflicting in some particulars. Under familiar rules we need only consider that which tends to support the findings and judgment.

Shortly after the contract of September 1, 1927, was executed, Smith, Ross, and perhaps Patterson, went to the bank for the purpose of arranging for the escrow. They took a copy of the contract with them. The manager of the bank, and later the collection teller, told them that the bank would not be a party to any such escrow; that Smith could leave his contracts for collection as before; that the bank would deposit the collections in Smith's checking account and that it would pay out any money it collected only on Smith's order; that this was the only capacity or manner in which the bank would act in the matter. In commenting on this situation Ross is quoted as saying, ''That don't make much difference, because Smith is worth it, anyway, and will pay it sometime.''

The refusal of the bank to act as escrow holder necessitated a modification of the plan proposed in the contract. The final arrangements made by the parties may be best defined by their actions.

The seven stockholders delivered all their stock direct to Smith and he paid them $58,333.33 for it. Smith reduced the contracts in the bank for collection by withdrawals so that the unpaid principal sums totaled slightly more than $100,000. Smith gave the bank written directions to pay to the seven stockholders the collections made on these contracts. This the bank did, after deducting its collection charges, with the exception that Smith may have drawn his personal checks for small amounts on this account. To offset these checks it appears that Smith permitted considerably more than the total amount of the personal checks, which amount was collected on a contract not connected with the El Cerrito Park Company, to be paid into this account and to be distributed to the seven stockholders. The bank collected $39,416.89 and paid $37,784.11 to the seven stockholders. No question is raised over the bank's deducting its collection charges from the money it collected. At least some, if not all, of the seven stockholders knew of this practice and asquiesced in it.

Some of Smith's purchasers defaulted in their payments on the conditional sales contracts. In 1929 this condition became serious. For a time Smith substituted current contracts for those in default but finally this had to be discontinued. When a purchaser stopped making payments his contract was delivered by the bank to Smith, who tried to make collections or to make adjustments of the balance due. At least Ross had knowledge of this practice. No objection was made to it. Finally all purchasers stopped making payments and all contracts were returned to Smith. The collection account was finally closed on August 4, 1934, the bank paying $194.11 to one of the attorneys for plaintiff upon the authority of plaintiff. After that date the bank had none of the contracts of sale in its possession nor was any money collected by it on any of those contracts.

Prior to the commencement of this action F. H. Patterson died and his claim under the contract of September 1, 1927, was distributed to his widow. It is interesting to note that this claim is described in the decree of distribution as "an unsecured account receivable of A. G. Smith for purchase of real estate in El Cerrito Heights". Mrs. Patterson, Kaidel, Sprigg, Douglass and Richards assigned their claims and demands to plaintiff who brought this action.

William A. Edwards died and the Security-First National Bank of Los Angeles was appointed as executor of his last will and testament. As the executor did not assign to or join with plaintiff in the action it was named a defendant. It filed a cross-complaint seeking recovery from the bank and Smith upon the same grounds as plaintiff.

Disregarding the fact of there being several counts, the amended complaint seems to allege the following causes of action against the bank; the contract of September 1, 1927, is plead *in haec verba;* that this contract provided for the sale of the stock to Smith for $116,666.66; that Smith paid on account $58,333.33; that the unpaid balance was to be secured by deposit in escrow of contracts of sales of lots in the El Cerrito Park Tract in the total principal sum of $100,000; that these contracts were deposited in escrow with the bank which accepted the escrow and agreed to hold them for the stockholders as security for Smith's indebtedness; that the bank violated its agreement and returned the contracts to Smith while there was still unpaid on his indebted-

ness to the seven stockholders the sum of $29,598.58, principal, besides interest. There are appropriate allegations of the various amounts of the principal and interest alleged to be due each of the stockholders. An accounting is sought from the bank and that it be required to sell the contracts deposited with it by Smith; that in the event it had lost possession or control of the contracts judgment be rendered against it for the balance unpaid by Smith, together with interest. The only judgment prayed for against Smith is that he has no right, title or interest in any of the contracts.

The trial court found against the contentions of plaintiff and the cross-complainant executor and in favor of the bank and Smith and rendered judgment accordingly. Plaintiff and cross-complainant appealed from the judgment and from the order denying their motion for new trial, which is not an appealable order. (Sec. 963, Code Civ. Proc.)

The trial court found that the bank refused to receive the escrow proposed by the stockholders and Smith; that it refused to receive or hold the conditional sales contracts other than as collection agent for Smith; that it only agreed to receive payments from purchasers and deposit them, less its collection charges, in Smith's checking account; that it only agreed to put out money from Smith's checking account on his order; that the "bank declined and refused to participate in the consummation of the transaction contemplated in" the contract of September 1, 1927, "or to act as an escrow holder or a pledgeholder in connection therewith or to assume any trust relationship with respect thereto or to enter into any contractual relationship in connection therewith with any of the parties thereto, except with the defendant and cross-defendant A. G. Smith; . . . that thereupon the terms and conditions of said 'Exhibit A', (contract of September 1, 1927), in so far as it was contemplated thereby that an escrow should be opened, were by the parties to said 'Exhibit A' abandoned and all of the persons named as parties of the second part to said 'Exhibit A' endorsed and transferred and delivered directly to said A. G. Smith, . . . all of the certificates representing shares of stock of El Cerrito Park Company, a corporation, owned by them and referred to in said 'Exhibit A'; that thereupon all intention of the parties to said 'Exhibit A' to have such instruments transferred and assigned by and from said A. G. Smith to

plaintiff A. L. Ross and the other parties named as parties of the second part to said 'Exhibit A' was abandoned''; that the bank distributed all the money received by it to the seven stockholders upon written order of Smith and in the proportions directed in writing by plaintiff and had returned all contracts to Smith.

It is clear from what we have already said, and the evidence we have outlined, that the findings of fact are sustained by material and competent evidence.

Appellants seem to have changed the theory of their case here from that set forth in their pleadings. They now urge that instead of the bank being liable for breach of contract in not holding the conditional sales contracts for the seven stockholders as security for Smith's indebtedness, the liability of the bank is based on breach of trust; that the contract of September 1, 1927, effected an equitable assignment of the conditional sales contracts to the seven stockholders; that the bank had knowledge of all of the terms of this contract; that it was charged with knowledge of the equitable ownership of the contracts by the seven stockholders; that it should have held the contracts for them or should have delivered the contracts to them, and that it breached its trust when it delivered the contracts to Smith.

This argument overlooks the pertinent findings of the trial court which in effect found a mutual abandonment of the terms of the contract of September 1, 1927, upon which appellants must rely to support the theory of equitable assignment, assuming, without holding, it could be supported. It also overlooks the finding of the substitution therefor of a parol contract which does not support the theory of equitable assignment as Smith retained both title to and possession of the contracts free from any claim of the seven stockholders and through his order to the bank only gave them the right to participate in the payments made by the purchasers named in the contracts as long as his order remained in effect. (See *Donovan* v. *Middlebrook*, 95 App. Div. 365 [88 N. Y. Supp. 607]; *In re Wood's Estate*, 243 Pa. 211 [89 Atl. 975]; *Hibernian Banking Assn.* v. *Davis*, 295 Ill. 537 [129 N. E. 540]; *In re Cleary*, 9 Wash. 605 [38 Pac. 79].)

The case of *Deeble* v. *Exchange Nat. Bank*, 32 Cal. App. 9 [161 Pac. 1010], is decisive of the question we are considering. In that case J. W. Young had conditional sales

contracts deposited for collection in the Exchange National Bank. Young was indebted to the plaintiff Deeble in the sum of $1460. Young gave Deeble an order directing the bank to pay Deeble part of the moneys collected by it on the contracts. The bank returned the contracts to Young before the Deeble debt was paid. In affirming the judgment of the trial court against Deeble it was said:

"The contention of plaintiff is that upon the giving of the written direction signed by Young to the bank, the bank became obligated to retain in its possession the contracts until an amount sufficient had been collected to satisfy the debt due from Young to the plaintiff. The difficulty with this position is that the bank was in nowise a debtor to Young. It was acting merely as Young's agent, and the written direction given to it constituted no assignment of amounts due from the purchasers of the land. The effect of the arrangement, as we read the allegations of the complaint, was only that so long as the bank continued to act as collector for Young it would pay over to the plaintiff, out of the proceeds of the contracts in its hands, the amounts directed to be paid by Young. The contract holders, debtors of Young, would have been in no way estopped from paying the money due from them directly to their creditor. Under the facts shown there could have been no release of the principal debt worked by the giving of the order by Young directing his agent to pay to his creditor, the plaintiff, enough money, if such was collected, to satisfy the debt. No doubt, as to the money actually collected by the bank, plaintiff was given the right to claim such a proportion as it was agreed should be paid therefrom, and to that extent the order might perhaps be said to work an equitable assignment in favor of plaintiff of the right to take that money. The contracts, as it appears, were held by the bank without any interest given to the defendant therein, and were held subject to the right of Young to retake them into his own possession upon demand."

■ Appellants urge that even if it be held there was no equitable assignment of the contracts of sale still it must be held there was an equitable assignment of the payments made into the bank by the purchasers under these conditional sales contracts. We may assume, without holding, that this argument is sound and still be unable to disturb the judgment. The trial court found that all the money collected by the

bank on the contracts had been paid to these stockholders. This finding is supported by all the evidence in the case with two minor exceptions which are more apparent than real. It is probably true that Smith drew small amounts for his personal use from this account in the bank. It is also true that there was paid into this account an amount of money much larger than the withdrawals by Smith, to which money appellants and their assignors had no claim and in which they had no right to participate. They were not damaged by these withdrawals by Smith as they must be held to have been made from collections to which appellants and their assignors had no claim. It is also true that the bank deducted its collection charges before making the disbursements to the seven stockholders with whom Smith contracted. These charges were deducted by the bank over a period of more than six years without objection by the seven stockholders, and some, if not all of them, were aware of the practice. This question was not raised in the trial court and is not urged here. It is apparent that appellants are not only estopped by their silence from claiming any portion of the collection charges but have waived any claim to them.

It is evident from what we have said that the judgment in favor of the bank must be affirmed. The judgment in favor of Smith requires further discussion.

In the amended complaint, and also in the cross-complaint, it is alleged that Smith promised to pay the seven stockholders $116,666.66 for their stock in El Cerrito Park Company and that he failed to perform this obligation. While the prayers of these pleadings do not contain requests for a money judgment against him their allegations are sufficient to support such a judgment had one been rendered. The evidence supports these allegations and it is clear that appellants might have obtained a judgment against Smith had they so desired. The record discloses that neither of the appellants pressed for a judgment against Smith in the trial court. They do not raise this question here. Perhaps this may be explained by the allegations in the complaint and cross-complaint that Smith was insolvent. As it seems evident that both appellants regarded a judgment against Smith without value, and as this question was not pressed in the trial court where they seemed interested only in recovering judgment against the bank, and as it is not raised

here, we hold that the error, if any, in not rendering judgment against Smith and in rendering judgment in his favor, was waived in the trial court and is waived here.

Judgment affirmed. The appeal from the order denying the motion for new trial is dismissed.

Barnard, P. J., and Jennings, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 17, 1937.